# EXHIBIT 1



**BRENDA D. FORMAN**
CLERK OF THE COURTS
browardclerk.org ■ BROWARD COUNTY, FLORIDA

| |

Menu ☰

⚠ The Clerk of Courts is currently offering the sale of 2 vehicles (/Miscellaneous/EvidenceSales#ForSale).

**Is your court hearing being held via Zoom? Learn more about Remote Court Hearings by Zoom (/GeneralInformation/Miscellaneous#RemoteHearingsbyZoom)**

# Case Detail - Public

 Print

### Phillip Dressel Plaintiff vs. BAYER CROPSCIENCE LP, et al Defendant

**Broward County Case Number:** CACE25005812
**State Reporting Number:** 062025CA005812AXXXCE
**Court Type:** Civil
**Case Type:** Products Liability
**Incident Date:** N/A
**Filing Date:** 04/21/2025
**Court Location:** Central Courthouse
**Case Status:** Active
**Magistrate Id / Name:** N/A
**Judge ID / Name:** Bidwill, Martin J

– Party(ies)                                              Total: 9

^

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address<br>★ Denotes Lead Attorney |
|---|---|---|---|
| Plaintiff | **Dressel, Phillip** | | ★ Mathews, D Todd<br>Retained<br>Bar ID: 163104<br>335 Logan Dr<br>O'Fallon, IL 62269<br>**Status: Active**<br><br>Olivert, Amanda<br>Retained<br>Bar ID: 1031302<br>Farah & Farah, P.A.<br>7130 College Pkwy<br>Fort Myers, FL 33907<br>**Status: Active** |
| Defendant | **BAYER CROPSCIENCE LP** | | ★ Vrasmasu, Mihai M<br>Retained<br>Bar ID: 28610<br>Shook Hardy & Bacon LLP<br>201 S Biscayne Blvd<br>Suite 3200<br>Miami, FL 33131<br>**Status: Active** |
| Defendant | **M & G ENTERPRISES OF VOLUSIA, INC** | | |
| Defendant | **MADDEN ENTERPRISES, INC** | | |
| Defendant | **DIAMOND R FERTILIZER CO. INC.** | | |
| Defendant | **GROWERS FERTILIZER CORP.** | | |

| Party Type | Party Name | ⊘ Address | ⊘ Attorneys / Address<br>★ Denotes Lead Attorney |
|---|---|---|---|
| Defendant | **HARRELL'S INC.** | | ★ Lafaurie, Jessica Lynn<br>Retained<br>Bar ID: 105304<br>Lydecker, LLP<br>1221 Brickell Ave Fl 19<br>Miami, FL 33131<br>**Status: Active**<br><br>Andrews, Forrest Lee, Jr.<br>Retained<br>Bar ID: 17782<br>Lydecker LLP<br>1221 Brickell Ave Fl 19<br>Miami, FL 33131<br>**Status: Active** |
| Defendant | **ANDREW JACK CONROY** | | ★ Vrasmasu, Mihai M<br>Retained<br>Bar ID: 28610<br>Shook Hardy & Bacon LLP<br>201 S Biscayne Blvd<br>Suite 3200<br>Miami, FL 33131<br>**Status: Active** |
| Defendant | **MONSANTO COMPANY** | | ★ Vrasmasu, Mihai M<br>Retained<br>Bar ID: 28610<br>Shook Hardy & Bacon LLP<br>201 S Biscayne Blvd<br>Suite 3200<br>Miami, FL 33131<br>**Status: Active** |

— Disposition(s)                                                    Total: 0

| Date | Statistical Closure(s) |
|---|---|

| Date | Disposition(s) | View / Pages |
|---|---|---|

## − Collection(s)                                                          Total: 0

| There is no Collection information available for this case. |
| --- |

## − Event(s) & Document(s)                                                 Total: 74

| Date | Description | Additional Text | View / Pages |
| --- | --- | --- | --- |
| 08/18/2025 | **Request for Copies** | | /3 |
| 08/15/2025 | **Notice of Service of Interrogs** | | /2 |
| 08/15/2025 | **Request to Produce** | | /10 |
| 08/14/2025 | **Notice of Filing Deposition** | | /3 |
| 08/14/2025 | **Cross Notice of Taking Deposition** | | /4 |
| 08/13/2025 | **Notice of Video Deposition** | | /7 |
| 08/13/2025 | **Notice of Filing Deposition** | | /3 |
| 08/13/2025 | **Cross Notice of Taking Deposition** | DEPO OF PHILLIP DRESSEL WEDNESDAY AUGUST 20,2025 1:00 PM Party: *Defendant* HARRELL'S INC. | /8 |
| 08/13/2025 | **Cross Notice of Taking Deposition** | DEPO OF PHILLIP DRESSEL THURSDAY AUGUST 21,2025 10:00 AM Party: *Defendant* HARRELL'S INC. | /8 |
| 08/12/2025 | **Request for Copies** | | /3 |
| 08/12/2025 | **Request for Copies (Pursuant to Rule 1.351)** | | /3 |
| 08/11/2025 | **Notice of Service** | | /7 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 08/11/2025 | **Not of Intent to Serve Subpoenas Under Rule 1.351** | NOTICE OF PRODUCTION OF NON-PARTY | 📄/2 |
| 08/04/2025 | **Notice of Video Deposition** | DEFENDANTS MONSANTO COMPANY, BAYER CROPSCIENCE LP, M&G ENTERPRISES OF VOLUSIA, INC., MADDEN ENTE PRISES, INC., DIAMOND R. FERTILIZER CO., INC., GROWERS FERTILIZER CORP. AND ANDREW JACK CONROY'S NO ICE OF TAKING VIDEOTAPED DEPOSITION DUCES TECUM OF PLAINTIFF PHILLIP DRESSEL | 📄/7 |
| 08/04/2025 | **Cross Notice of Taking Deposition** | DEFENDANTS MONSANTO COMPANY, BAYER CROPSCIENCE LP, M&G ENTERPRISES OF VOLUSIA, INC., MADDEN ENTE PRISES, INC., DIAMOND R. FERTILIZER CO., INC., GROWERS FERTILIZER CORP. AND ANDREW JACK CONROY'S CR SS-NOTICE OF TAKING THE PRESERVATION DEPOSITION OF | 📄/4 |
| 07/30/2025 | **Uniform Trial Order/Setting Case for Trial - General** | | 📄/4 |
| 07/29/2025 | **Uniform Order Setting Pretrial Deadline** | | 📄/2 |
| 07/29/2025 | **Notice of Service** | | 📄/2 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 07/28/2025 | **Notice of Filing** | | /221 |
| 07/28/2025 | **Order Extending Time** | Granted | /2 |
| 07/25/2025 | **Notice of Filing Affidavit** | | /3 |
| 07/25/2025 | **Motion for Extension of Time** | , PHILLIP DRESSEL , PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO PRODUCE INITIAL DISCOVERY DISCLOSURES | /7 |
| 07/23/2025 | **Opposition** | | /17 |
| 07/23/2025 | **Notice of Filing Deposition** | | /3 |
| 07/23/2025 | **Uniform Case Management Order - General** | | /12 |
| 07/17/2025 | **Notice of Appearance** | PHILLIP DRESSEL | /2 |
| 07/17/2025 | **Notice of Appearance** | Devin van der Hahn | /2 |
| 07/16/2025 | **Notice of Filing** | | /2 |
| 07/16/2025 | **Notice of Appearance** | PHILLIP DRESSEL | /2 |
| 07/16/2025 | **Notice of Appearance** | Phillip Dressel | /2 |
| 07/10/2025 | **Amended** | NOTICE OF SERVING FIRST SET OF INTERROGATORIES DIRECTED TO PHILLIP DRESSEL Party: *Defendant* MONSANTO COMPANY | /3 |
| 07/07/2025 | **Order** | pro hac vice | /2 |
| 07/07/2025 | **Order** | pro hac vice | /2 |

| Date | Description | Additional Text | View / Pages |
|---|---|---|---|
| 07/07/2025 | **Order Granting Motion** | pro hac vice | 📄/2 |
| 07/07/2025 | **Order Granting Motion** | pro hac vice | 📄/2 |
| 07/03/2025 | **Motion to Appear Pro Hac Vice** | | 📄/5 |
| 07/03/2025 | **Motion to Appear Pro Hac Vice** | | 📄/5 |
| 07/03/2025 | **Motion to Appear Pro Hac Vice** | | 📄/5 |
| 07/03/2025 | **Motion to Appear Pro Hac Vice** | | 📄/5 |
| 07/01/2025 | **Notice of Service of Interrogs** | | 📄/3 |
| 07/01/2025 | **Request to Produce** | | 📄/40 |
| 07/01/2025 | **Request for Admissions** | | 📄/7 |
| 06/23/2025 | **Notice of Appearance** | Party: *Defendant* HARRELL'S INC. | 📄/2 |
| 06/23/2025 | **Answer & Demand for Jury Trial** | TO PLAINTIFF'S COMPLAINT Party: *Defendant* HARRELL'S INC. | 📄/49 |
| 06/23/2025 | **Notice of Filing Designation of Emailing Addresses** | | 📄/2 |
| 06/16/2025 | **Answer to Complaint** | Party: *Defendant* MONSANTO COMPANY | 📄/39 |
| 06/16/2025 | **Answer to Complaint** | Party: *Defendant* DIAMOND R FERTILIZER CO. INC. | 📄/29 |
| 06/16/2025 | **Answer to Complaint** | Party: *Defendant* ANDREW JACK CONROY | 📄/30 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 06/03/2025 | **Notice of Hearing** | | 📄/3 |
| 05/27/2025 | **Summons Returned Served** | Madden Enterprises, Inc., 5/24/2025 12:34 PM | 📄/1 |
| 05/27/2025 | **Summons Returned Served** | M&G Enterprises of Volusia, Inc., 5/24/2025 12:35 PM | 📄/1 |
| 05/20/2025 | **Motion to Set Cause for Trial** | PLAINTIFF'S MOTION FOR EXPEDITED TRIAL DATE<br>Party: *Plaintiff* Dressel, Phillip | 📄/5 |
| 05/19/2025 | **Answer to Complaint** | Party: *Defendant* BAYER CROPSCIENCE LP | 📄/34 |
| 05/16/2025 | **Order Appointing Process Server** | | 📄/1 |
| 05/13/2025 | **Summons Returned Served** | Growers Fertilizer Corp. c/o c/o Registered Agent John W. Strang, 5/09/2025 1:30 PM | 📄/1 |
| 05/08/2025 | **Summons Returned Served** | Bayer CropScience, LP c/o c/o Corporation Service Company, REGISTERED AGENT, 4/29/2025 12:15 PM | 📄/1 |
| 05/08/2025 | **Summons Returned Served** | Ben Hill Griffin, Inc. c/o STEWART HURST, REGISTERED AGENT, 4/28/2025 5:44 PM | 📄/1 |
| 05/08/2025 | **Summons Returned Served** | Andrew Jack Conroy, 4/29/2025 11:30 AM | 📄/1 |
| 05/08/2025 | **Summons Returned Served** | Diamond R. Fertilizer Co., Inc. c/o Registered Agent Michael Hudson, 4/28/2025 9:22 PM | 📄/1 |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 05/08/2025 | **Summons Returned Served** | Harrell s Inc. c/o c/o CT Corporation System, 5/05/2025 2:09 PM | 📄 /1 |
| 05/08/2025 | **Summons Returned Served** | Monsanto Company c/o Corporation Service Company, REGISTERED AGENT, 5/02/2025 1:57 PM | 📄 /1 |
| 05/08/2025 | **Motion to Appoint Process Server** | MOTION TO APPOINT SPECIAL PROCESS SERVER<br>Party: *Plaintiff* Dressel, Phillip | 📄 /3 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: BAYER CROPSCIENCE, LP | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: BEN HILL GRIFFIN, INC | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: ANDREW JACK CONROY | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: DIAMOND R FERTILIZER CO., INC | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: GROWERS FERTILIZER CORP | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: HARRELL'S INC | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: M&G ENTERPRISES OF VOLUSIA, INC | 📄 /2 |
| 04/25/2025 | **eSummons Issuance** | ISSUED ON: MADDEN ENTERPRISES, INC | 📄 /2 |
| 04/24/2025 | **eSummons Issuance** | ISSUED ON: MONSANTO COMPANY | 📄 /2 |
| 04/21/2025 | **Per AOSC20-23 Amd12, Case is determined General** | | |

| Date | Description | Additional Text | View / Pages |
|------|-------------|-----------------|--------------|
| 04/21/2025 | **Civil Cover Sheet** | Amount: $100,001.00 | 📄/3 |
| 04/21/2025 | **Complaint (eFiled)** | | 📄/65 |

---

**–** Hearing(s)                                    Total: 0

**There is no Disposition information available for this case.**

---

**–** Related Case(s)                               Total: 0

**There is no related case information available for this case.**

## Brenda D. Forman

## Clerk of Court

Broward County
17th Judicial Circuit

MORE ABOUT THE CLERK (/ABOUTUS/ABOUTTHEOFFICE#ABOUTTHECLERK)                                    >

 (https://www.facebook.com/browardclerkofcourts/)

## Connect with Us

COURTHOUSE LOCATIONS (/ABOUTUS/HOURSANDLOCATIONS#COURTHOUSELOCATIONS)                              >

CONTACT US (/ABOUTUS/ABOUTTHEOFFICE#CONTACTUS)                                                     >

DISCLAIMER AGREEMENT (/GENERALINFORMATION/MISCELLANEOUS#DISCLAIMERAGREEMENT)                       >

CLERK DIRECTORY (/ABOUTUS/HOURSANDLOCATIONS#CLERKDIRECTORY)                                        >

TELL US WHAT YOU THINK (/MISCELLANEOUS/CLERKSURVEYS)                                             ^ >

## Accessibility & Support

ADA NOTICE (/GENERALINFORMATION/MISCELLANEOUS#ADA) &#9855;

PRINT &#128438;

FREQUENTLY ASKED QUESTIONS (HTTPS://WWW.BROWARDCLERK.ORG//WEB2/CASESEARCHECA/FREQUENTQUESTIONS/)

GLOSSARY OF TERMS (HTTPS://WWW.BROWARDCLERK.ORG//WEB2/CASESEARCHECA/GLOSSARY/) »

## Main Courthouse Location

201 SE 6th Street

Fort Lauderdale
Florida, US 33301
Phone: (954) 831-6565

PUBLIC RECORDS CUSTODIAN (/GENERALINFORMATION/MISCELLANEOUS#PUBLICRECORDSCUSTODIAN) ›
*PURSUANT TO 119.12(2), F.S.*

PUBLIC ACCESS TO JUDICIAL RECORDS (/GENERALINFORMATION/MISCELLANEOUS#JUDICIALRECORDRULE) ›
*PURSUANT TO RULE 2.420*

Under Florida law, email addresses are public records. If you do not want your email address released in response to a public records request, do not send electronic mail to this entity.
Instead, contact this office by phone or in writing.
© 2025 - All rights reserved

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT IN
AND FOR BROWARD COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.

JURY TRIAL DEMANDED

PHILLIP DRESSEL,
a Florida Resident,

     Plaintiff,

vs.

MONSANTO COMPANY, a foreign
corporation;
BAYER CROPSCIENCE LP, a foreign limited
partnership;
M&G ENTERPRISES OF VOLUSIA, INC., a
Florida corporation;
MADDEN ENTERPRISES, INC., a Florida
corporation;
DIAMOND R FERTILIZER CO., INC., a Florida
corporation;
BEN HILL GRIFFIN, INC., a Florida corporation;
GROWERS FERTILIZER CORP., a Florida
corporation; and
HARRELL'S INC., a Florida corporation, and
ANDREW JACK CONROY, a Florida resident.

     Defendants.

_____/

## **COMPLAINT FOR PERSONAL INJURIES**

     Plaintiff, Phillip Dressel, brings this action against Defendants, Monsanto Company, Bayer

CropScience LP, M&G Enterprises of Volusia, Inc., Madden Enterprises, Inc., Diamond R

Fertilizer Co., Inc., Ben Hill Griffin, Inc., Growers Fertilizer Corp., Harrell's Inc., and Andrew

Jack Conroy and alleges as follows:

## **INTRODUCTION**

1.      This is a civil action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, warning, promoting, marketing, advertising, distribution, labeling, and/or sale of glyphosate-containing, Roundup products.

## **PARTIES**

2.      At all times material, Plaintiff Phillip Dressel was a resident of Saint Lucie County, Florida. Plaintiff is pictured below in a photo taken before he received his cancer diagnosis.



2

3. "Roundup" refers to all formulations of Defendants' Roundup products containing the active ingredient glyphosate, including, but not limited to, Roundup Quick Pro (pictured below), Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Readyto-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, AquaMaster, and any other Roundup formulation containing the active ingredient glyphosate.



4.      At all times material, Defendant Monsanto Company ("Monsanto") was a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri.  Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup, which contains the active ingredient glyphosate, as well as other purportedly "inert" ingredients and impurities.

5.      Defendant Bayer CropScience LP ("Bayer") is a foreign limited partnership organized under the laws of the State of Delaware, with a principal office at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina, 27709. Bayer is registered to do business in Florida, and can be served through its registered agent, Corporation Service Company at 1201 Hays Street, Tallahassee, Florida 32301. Bayer, along with the other Bayer entities listed herein, acquired Monsanto on or around June 7, 2018.

6.      Non-Party Bayer AG is the parent company of Bayer CropScience LP.

7.      Upon information and belief, and at all times relevant herein, Defendant Bayer CropScience, on behalf of Bayer AG, began to sell Roundup products following the acquisition of Monsanto on or about June 7, 2018.

8.      Upon information and belief, and at all times relevant herein, Defendant Monsanto authorized and directed and/or participated in the promotion and sales of the Roundup products at issue in this case, when the company knew or should have known of the increased hazards and unreasonably dangerous propensities of the Roundup products, and thereby actively participated in the tortious conduct that resulted in serious injuries to the Plaintiffs as described herein.

9.      Upon information and belief, and at all times relevant herein, Defendant Bayer CropScience authorized and directed and/or participated in the promotion and sales of the Roundup products at issue in this case, when the company knew or should have known of the increased

4

hazards and unreasonably dangerous propensities of the Roundup products, and thereby actively participated in the tortious conduct that resulted in serious injuries to the Plaintiffs as described herein.

10. Upon information and belief and at all times relevant herein, Defendant Bayer CropScience authorized and directed and/or participated in the promotion and sales of the Roundup products at issue in this case, when the company knew or should have known of the increased hazards and unreasonably dangerous propensities of the Roundup products, and thereby actively participated in the tortious conduct that resulted in serious injuries to the Plaintiffs as described herein.

11. Upon information and belief, and at all times relevant herein, Defendants, and each of them, were engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promotion, packaging, and/or advertising for sale, and selling, the Roundup products at issue in this case.

12. Defendants Bayer CropScience will be referred to as "Bayer" or the "Bayer Defendants."

13. Upon information and belief, upon acquisition of Defendant Monsanto, Bayer acquired and assumed all liabilities that may arise from Defendant Monsanto's past conduct.

14. At all times material, Defendant M&G Enterprises of Volusia, Inc. ("M&G") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Holly Hill, Florida. Defendant M&G distributed glyphosate-based herbicides, including Roundup products, to Plaintiff and his employers during the period of 1990 to 2022.

15. At all times material, Defendant Madden Enterprises, Inc. ("Madden;" together with M&G, the "ACE Defendants") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Holly Hill, Florida. Defendant Madden distributed glyphosate-based herbicides, including Roundup products, to Plaintiff and his employers during the period of 1990 to 2022.

16. At all times material, Defendant Diamond R Fertilizer Co., Inc. ("Diamond R") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Fort Pierce, Florida. Defendant Diamond R distributed glyphosate-based herbicides, including Roundup products, to Plaintiff and his employers during the period of 1990 to 2022.

17. At all times material, Defendant Ben Hill Griffin, Inc. ("Griffin") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Frostproof, Florida. Defendant Griffin distributed glyphosate-based herbicides, including Roundup products, to Plaintiff and his employers during the period of 1990 to 2022.

18. At all times material, Defendant Growers Fertilizer Corp. ("Growers") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Lake Alfred, Florida. Defendant Griffin distributed glyphosate-based herbicides, including Roundup products, to Plaintiff and his employers during the period of 1990 to 2022.

19. At all times material, Defendant Harrell's, Inc. ("Harrells") was and is a corporation organized under the laws of the State of Florida with its principal place of business in Lakeland, Florida. Defendant Harrells distributed glyphosate-based herbicides, including Roundup products, to Plaintiff and his employers during the period of 1990 to 2022.

20.     At all times material, Defendant Andrew Jack Conroy was employed by Monsanto as its industrial, turf and ornamental (ITO) herbicide Representative for the Eastern United States, including Florida. Defendant Andrew Jack Conroy is a resident of Polk County, Florida.

<strong>JURISDICTIONAL AND VENUE ALLEGATIONS</strong>

21.     This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00), exclusive of costs, interest and attorneys' fees, for each count alleged herein and is therefore within the jurisdictional limits of this Court.

22.     Defendant Monsanto has been authorized to do business in the State of Florida and was transacting or conducting business in the State of Florida, and has derived substantial revenue from goods and products, including Roundup, used in the State of Florida. At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

23.     Defendant Monsanto also consented to jurisdiction by registering to do business in Florida. Defendant Monsanto's Registered Agent is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301-2525.

24.     Defendant Andrew Jack Conroy is a resident of Polk County, Florida.

25.     Defendant Diamond R is a Florida corporation transacting or conducting business in the State of Florida. Defendant Diamond R's registered agent is Michael Hudson at 4100 Glades Cut-Off Road, Fort Pierce, Florida 34981.

26.     Defendant Griffin is a Florida corporation transacting or conducting business in the State of Florida. Defendant Griffin's registered agent is Stewart Hurst at 700 Scenic Highway, Frostproof, Florida 33843.

27.     Defendant Growers is a Florida corporation transacting or conducting business in the State of Florida. Defendant Growers' registered agent is John Strang at 312 N. Buena Vista Drive, Lake Alfred, Florida 33850.

28.     Defendant Harrells is a Florida corporation transacting or conducting business in the State of Florida. Defendant Harrells' registered agent is CT Corporation System at 1200 South Pine Island Road, Plantation, Florida 33324.

29.     In addition to the allegations stated above, this Court has personal jurisdiction over all of the Defendants pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6). Plaintiff's claims arise out of Defendants' operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to life and property in this state arising out of Defendants' acts and omissions outside this state. At or about the time of such injuries, products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

30.     Venue is proper in Broward County, Florida pursuant to FL Stat. 47.051, in that Plaintiff used the Defendants product in Broward County, wherein his cause of action accrued.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

31.     Glyphosate is the active ingredient in Roundup.

32.     Glyphosate is a non-selective herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme known as EPSP synthase.

33.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids for protein synthesis. Treated plants generally die within two to three days. Because plants absorb

glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

34.     In addition to the active ingredient glyphosate, Roundup formulations, as well as other glyphosate-based product formulations such as Rodeo and Aqua Star, also contain adjuvants and/or other "inert" chemicals. These component parts are designed to help glyphosate penetrate the leaves and membranes of plants since glyphosate by itself is poorly absorbed. These adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right and often contain chemicals which themselves are carcinogenic like 1,4-dioxane, and ethylene oxide.

35.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

36.     Today, glyphosate products are among the world's most widely used herbicides. Glyphosate-based products are registered in more than 130 countries and are approved for weed control in more than 100 crops.

37.     Since the mid-1970s, Roundup, and later other glyphosate-based products, have been used across the world by people who have not had knowledge of the dangers their use poses.

38.     Since Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Monsanto assured the public that Roundup was harmless to humans and continues

to assure the public that it is safe despite evidence to the contrary. Monsanto fails to disclose and actively conceals information demonstrating that its products are harmful to human health.

### Registration of Herbicides under Federal Law

39.    The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

40.    The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

41.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

42.    The EPA registered Roundup for distribution, sale, and manufacture in the United States and the state of Florida.

43.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

44.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[1]

**The EPA Finds Fraud**

45.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

46.     In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology

---

[1] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at https://archive.org/details/SecondPeerReviewOfGlyphosateEPAOct301991.

studies relating to Roundup.[2] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

47.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. Following the lead of the FDA, the EPA subsequently audited IBT. Like the FDA, the EPS also found the toxicology studies conducted for the Roundup herbicide to be invalid.[3]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[4]

48.    Three top executives of IBT were convicted of fraud in 1983.

49.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[5]

---

[2] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

[3] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at
https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-
&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[4] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C (August 9, 1978)).

[5] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra note 2.

50.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in over one hundred countries.

### The Importance of Roundup to Monsanto's Market Dominance Profits

51.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

52.     In response, Monsanto began the development and sale of genetically-engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without banning the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

53.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto's Knowledge About the Toxicity of Roundup

54.     Since Roundup was introduced to the market, Monsanto has made broad claims through its advertising and promotional materials that its products are safe, non-toxic, and rigorously tested. But, in reality, the company hardly tested the real-world toxicity of its products, actively avoided pursuing studies which might show unwelcome results, and ghostwrote studies of supposedly independent scientists.

55.     The first valid chronic oncogenicity study on glyphosate was submitted to the EPA in 1983 (the Bio/dynamic mouse study). It showed an increase in renal tubular adenomas in the male mice that Monsanto claimed was not treatment-related. The EPA disagreed and classified glyphosate as a "possible human oncogen" in 1985.

56.     Monsanto challenged the EPA's determination through multiple avenues, for years, leading to an EPA request for Monsanto to do a new and better study. A Scientific Advisory Panel convened by the EPA to provide guidance in resolving the controversy over the 1983 Bio/dynamic study called for a repeat study. The EPA adopted the SAP's advice and required a repeat mouse 7study in its 1986 Registration Standard document on glyphosate. Monsanto refused to conduct it and, upon information and belief, has not done so to this day.

57.     The 1986 glyphosate Registration Standard document issued by the EPA required Monsanto to add several commonsense worker-safety provisions onto Roundup product labels (e.g., wear gloves, chemical resistant shoes, and goggles or a face shield when applying Roundup; discard clothes that are drenched; wash clothes separately from other laundry). Monsanto refused to add the majority of these provisions to their product labels.

58.     Monsanto has refused since the mid-1980s to conduct the studies needed to resolve uncertainty over the oncogenicity of Roundup, including studies specifically requested by the EPA. The failure of Monsanto to invest in new and better science, such as the more powerful

mouse cancer replacement study requested by the EPA in 1986, has perpetuated scientific uncertainty and undermined the EPA's ability to understand and quantify the health risks of Roundup.

59.     Dr. Donna Farmer, a senior Monsanto scientist, wrote the following to a Monsanto communications professional: "You cannot say that Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement. The testing of the formulations are not anywhere near the level of the [testing on] the active ingredient."

> The terms glyphosate and Roundup cannot be used interchangeably nor can you use "Roundup" for all glyphosate-based herbicides any more.  For example you cannot say that Roundup is not a carcinogen...we have not done the necessary testing on the formulation to make that statement.  The testing on the formulations are not anywhere near the level of the active ingredient. We can make that statement about glyphosate and can infer that there is no reason to believe that Roundup would cause cancer.

60.     In the same email, Dr. Farmer warned that Monsanto "cannot support the statement" that Roundup produces "'no adverse effects whatsoever on flora, or fauna or on the human body.'" This is because, as Dr. Farmer explained, "[a]dverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts."

> We cannot support the statement about "no adverse effects whatsoever on flora, or fauna or on the human body".  Adverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna - in studies with laboratory animals - even death is seen (LD50 studies for example) and in humans - mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts.  Therefore we advise using the phrase...."When Roundup herbicides are used according to label directions, no unreasonable adverse effects to people, wildlife, and the environment are expected."

61.     In addition to the active ingredient glyphosate, surfactants are added to Roundup products to speed up the movement of glyphosate through weed leaf surfaces, and then into the cells of weeds. Roundup surfactants act roughly the same way when Roundup comes into contact

with human skin. In other words, the formulation penetrates human skin, making Roundup markedly more toxic to exposed humans than glyphosate alone.

62. For decades, there have been multiple studies showing that formulated Roundup is more toxic than pure, 100% technical glyphosate. Most of the surfactants in Roundup-brand herbicides are even more toxic, ounce for ounce, than glyphosate. Plus, pure glyphosate does not move as readily through the skin or into cells, whereas Roundup does.

63. Despite knowledge of the differences in toxicity and risks arising from exposures to formulated Roundup in contrast to pure glyphosate, Monsanto has not carried out critical, long-term cancer feeding studies with Roundup. Nor has anyone else.

64. Monsanto has refused to conduct state-of-the-art genotoxicity assays in mammals and in human populations exposed to formulated Roundup.

65. In 1999, Monsanto hired Dr. James Parry, a world-renowned genotoxicity expert, to advise the company on what steps it should take to better understand and respond to public literature studies reporting evidence of a genotoxic response following exposures to glyphosate and/or a glyphosate-based herbicide. Dr. Parry identified several deficiencies in the available data on glyphosate. For one, he explained there is "[n]o adequate in vitro clastogenicity data available for glyphosate formulations." He thus recommended that Monsanto "provide comprehensive in vitro cytogenetic data on glyphosate formulations." He also concluded, "[m]y overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded . . . it may be necessary to consider the possibility of susceptible groups within the human population."

66.     In total, Dr. Parry provided Monsanto 11 specific recommendations for further genotoxicity research. Monsanto refused to conduct new studies in 9 of the 11 areas. In a September 1999 email, Monsanto's chief of regulatory science, William Heydens, wrote to his Monsanto colleagues after reading Dr. Parry's report on glyphosate. In his correspondence, Heydens stated: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

> However, let's step back and look at what we are really trying to achieve here. We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox. issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests. Mark, do you think Parry can become a strong advocate without doing this work Parry?   If not, we should **_seriously_** start looking for one or more other individuals to work with. Even if we think we can eventually bring Parry around closer to where we need him, we should be currently looking for a second/back-up genetox. supporter. We have not made much progress and are currently very vulnerable in this area. We have time to fix that, but only if we make this a high priority now.

67.     In another email the same month, Monsanto executive Stephen Wratten said he was "disappointed in the Parry report," asking "[h]as he ever worked with industry before on this sort of project?" Later in the same email, Wratten intoned that the Parry report is not useful for Monsanto: "I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much…."

> Overall, I guess we have his recommendation of studies that could be used to strengthen the database on p. 4. , but that is about it.  I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful.  Hope it didn't cost much. Perhaps this is too harsh, and I don't know what your proposal to him was, but I guess I would expect more than this of a Professor.

68.     Later on, in the same email chain, Monsanto toxicologist Donna Farmer discussed the fallout from Dr. Parry's report on glyphosate with her colleagues. She wrote: "right now the only person I think that can dig us out of this 'genetox hole' is the Good Dr. Kier . . . I am concerned about leaving Perry [sic] out there with this as the final project/his final impressions . . . ."

> One option...I agree we need someone else to interface with Perry...right now the only person I think that can dig us out of this "genotox hole" is the Good Dr. Kier....
>
> other option....I am concerned about leaving Perry out there with this as the final project/his final impressions.................if you remember his first report...he was looking for work for a graduate student (I wonder if this evaluation was his or someone else's?)
>
> Maybe you, Bill, Larry, Steve and I can get together to figure out where and how we go from here...Steve's opinion of the report was pretty clear....he also suggested as an option to drop Perry.

69.     In correspondence, Monsanto personnel expressed reluctance to conduct studies on glyphosate, Roundup formulations, or surfactant ingredients, suggesting Monsanto was concerned about the results it would find it if did the tests. In a September 1999 email, for example, Stephen Wratten criticized the Parry report by noting that "of course" Monsanto knew there was no data to support points it wanted to make relating to Roundup's genotoxicity, and Monsanto scientists "didn't need [Dr. Parry] to tell [them] that." What Monsanto wanted Dr. Parry to do (instead of suggesting additional independent and rigorous testing) was to argue *against* the reliability of independent studies that were bad for Monsanto's bottom line:

> 8.  Of course we know there were no data of the type listed in points 2, 3, and 4 on p. 3.  We didn't need him to tell us that.  The key point is whether the conclusions of Bolognesi, and Rank can be discounted on the basis of the strength and number of studies at hand, or whether their experiments need to be repeated independently to credibly refute the findings.  Of course we knew that the latter would be the most convincing approach, but we need him to make any arguments that can be made on the data we have.

18

70.     In another email from 1999, Dr. Farmer resisted the suggestion that the company do additional studies on the genotoxicity of Roundup, including formulations or other surfactant ingredients:

> It is too premature to discuss conducting any studies. I will not support doing any studies on glyphosate, formulations or other surfactant ingredients at this time with the limited information we have on the situation. As Bill indicated below we have a ton of data .....that was submitted and reviewed.

71.     Other internal correspondence demonstrates that some of Monsanto's executives were concerned about the safety of Roundup and results that would be obtained if Roundup were rigorously tested according to Parry's recommendations. One Monsanto scientist wrote in 2001: "If someone came to me and said they wanted to test Roundup I know how I would react – with serious concern."

72.     Comments made by other Monsanto executives indicate their awareness that glyphosate becomes toxic when mixed with other ingredients. Thus, the formulated product— Roundup—is more toxic than its active ingredient. In 2002, William Heydens and Donna Farmer discussed various studies observing adverse effects by the formulated Roundup product. Specifically, Farmer acknowledged: "[t]he interest point is glyphosate all basically had no effect the formulated product did – does this point us to the coformulants – sufactants? [sic]" Heydens also admitted, after discussing with Monsanto consultant John DeSesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants. . . . What I've been hearing from you is that this continues to be the case with these studies – Glyphosate is OK but the formulated product (and thus the surfactant) does the damage."

> Your last comment hits exactly where I am coming from.  We discussed the situation with Holson and DeSesso and concluded, not surprisingly, that we are in pretty good shape with glyphosate but vulnerable with surfactants.  What I've been hearing from you is that this continues to be the case with these studies - Glyphosate is OK but the formulated product (and thus the surfactant) does the damage.

73.     Despite Monsanto's longstanding awareness of the danger of the formulated product, and the damage caused by the addition to Roundup of the surfactants in particular, Monsanto's website continues to advertise, to this day, that "Glyphosate-based herbicides, including Roundup-brand formulated products with surfactants, all have a long history of safe use and do not pose any unreasonable risk to human health when used according to label directions."[6]



74.     Rather than conduct the more sophisticated genotoxicity studies recommended by Dr. Parry and others, Monsanto instead commissioned members of its third-party network of glyphosate-friendly scientists to write and publish articles arguing that evidence of genotoxicity in public literature studies is the result of flawed study designs, excessive dose levels, inappropriate routes of administration, overt toxicity, or other technical problems. Many of these reviews were ghost-written by Monsanto scientists not listed among the co-authors.

75.     Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" and PR campaigns in support of the safety of glyphosate and Roundup-brand herbicides. In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a defined task. Many of

---

[6]     *See* Monsanto's webpage "What is a surfactant?," available at. It is available at https://monsanto.com/products/safety-information/what-is-a-surfactant/.

these glyphosate-friendly experts had once worked for Monsanto. Many have authored or co-authored papers commissioned and paid for by Monsanto. Most of these papers contained passages ghost-written by Monsanto scientists, and some were largely ghost-written by Monsanto. "Ghost-writing" refers to contributions to a written document by a person not listed as the author, or among the co-authors of the document. The practice is considered to be serious ethical misconduct.

76.     As far back as 1999, Monsanto was operating behind the scenes to influence the science and bolster the public perception of the safety of glyphosate and Roundup. William Heydens, the Monsanto executive who spearheaded Monsanto's manipulation of the scientific literature via ghostwriting, wrote in a May 1999 email that Monsanto's plan for scientific outreach planning involved maintaining a cohort of "outside scientific experts who are influential at driving science, regulators, public opinion, etc. We would have they [sic] people directly or indirectly/behind-the-scenes work on our behalf."

```
2)  Outside scientific experts who are influential at driving science, regulators, public opinion, etc.
We would have they people directly or indirectly/behind-the-scenes work on our behalf.

3)  Presentations/publications in the scientific literature.  Get our data out there so it can be
referenced and used to counter-balance the negative stuff.  In some cases, we may want to publish
specific work in certain world areas to help out in that region.  We may use our experts as authors (eg.
the CanTox project in which you were fortunate enough to participate).
```

77.     Heydens succinctly summarized Monsanto's goal: to encourage "people to get up and shout Glyphosate is Non-toxic."

78.     The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" (SO Plan) appears at the beginning of a June 1999 document: "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or the environment. This support [from third-party network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena."

21

79.     The unconditional statement in the above-quoted paragraph—"no threat to human health or the environment"—stands in sharp contrast to the more nuanced statements by scientists Monsanto itself commissioned to review the genotoxicity or oncogenicity literature, or by the EPA. No scientist has been willing to say that Roundup poses no threat to human health. For example, Kier and Kirkland, two Monsanto-commissioned scientists, concluded in a 2013 review of glyphosate genotoxicity that "Glyphosate and typical [glyphosate-based herbicides] do not appear to present significant genotoxic risk under normal conditions of human or environmental exposures." The scientists do not rule out the possibility of *some* genotoxic risk from exposures to glyphosate-based herbicides under normal conditions, nor the possibility of *significant* genotoxic risk in the event of unusually high glyphosate-based herbicide exposure episodes.

80.     Over the years, Monsanto systematically attacked scientists whose research threatened their profits. For example, in an April 2001 email, Heydens warned his colleagues that "[d]ata generated by academics has always been a major concern for us in the defense of our products."

| Message | |
|---|---|
| From: | HEYDENS, WILLIAM F [FND/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
| Sent: | 4/10/2001 6:09:25 PM |
| To: | JACOBS, ERIK [AG/5040] [erik.jacobs@monsanto.com]; MARTENS, MARK A [AG/5040] [mark.a.martens@monsanto.com]; MCKENNA, RUTH M [AG/5040] [ruth.m.mckenna@monsanto.com]; VAN BOSSUYT, ALFRED [AG/5035] [alfred.van.bossuyt@monsanto.com] |
| Subject: | RE: Propachlor sample request |

All,

Please don't do anything until we discuss this.  Data generated by academics has always been a major concern for us in the defense of our products.

81.     In an email from October 2008, Dean Nasser, a Monsanto employee, sent his colleagues a study showing the link between glyphosate and non-Hodgkin's lymphoma:

-----Original Message-----
**From:** Nasser Dean █████████████████
**Sent:** Tuesday, October 14, 2008 11:33 AM
**To:** Scott Kohne ; Karen Cain ; FARMER, DONNA R [AG/1000]; GOUGH, GEORGE N [AG/1230]; █████████
**Cc:** McAllister, Ray
**Subject:** Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma - Beyond Pesticides, October 14

**Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma**

**(Beyond Pesticides, October 14, 2008)**

82.     Dr. Farmer responded: "We have been aware of this paper for awhile and knew it

would only be a matter of time before the activists pick it up… how do we combat this?"

Nassar,

Thank you for fowarding this. We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up. I have some epi experts reviewing it. As soon as I have that review we will pull together a backgrounder to use in response.

Here is their bottom line…how do we combat this?

Avoid carcinogenic herbicides in foods by supporting organic agriculture, and on lawns by using non-toxic land care strategies that rely on soil health, not toxic herbicides.

83.     In 2012, Monsanto executives discussed their efforts to retract a paper written by

Professor Seralini in the journal Food and Chemical Toxicology, which pertained to the biological

plausibility of glyphosate as a human carcinogen—a conclusion adverse to Monsanto's

commercial agenda. Specifically, Monsanto executives galvanized scientists to send letters to the

magazine's Editor-in-Chief seeking retraction of the Seralini study. In correspondence from

September 2012, Monsanto employee Dr. Goldstein stated: "I was uncomfortable even letting

shareholders know we are aware of this LTE…it implies we had something to do with it-otherwise

how do we have knowledge of it? I could add 'Aware of multiple letters to editor including one

signed by 25 scientists from 14 countries' if you both think this is OK." He added that he was

being asked "to keep internal correspondence down on this subject."

23

> Considered doing this already- but I was uncomfortable even letting shareholders know we are aware of this LTE.... It implies we had something to do with it- otherwise how do we have knowledge of it?
>
> I could add "Aware of multiple letters to editor including one signed by 25 scientists from 14 countries" if you both think this is OK.
>
> We are being asked to keep internal correspondence down on this subject.

84.     In response, Eric Sachs said: "We are 'connected' but did not write the letter or encourage anyone to sign it."

85.     In a document outlining the "Business Goals" of Monsanto employee David Saltmiras for the fiscal year 2013, Dr. Saltmiras wrote: "Throughout the late 2012 Seralini rat cancer publication and media campaign, I leveraged my relationship the Editor of Chief of the publishing journal, Food and Chemical Toxicology and was the single point of contact between Monsanto and the Journal." Moreover, Dr. Saltmiras acknowledged that he "[s]uccessfully facilitated numerous third-party expert letters to the editor which were subsequently published, reflecting the numerous significant deficiencies, poor study design, biased reporting and selective statistics employed by Seralini."

86.     In multiple other letters and correspondence, Monsanto has expressed its intent to attack independent scientists who raised concerns about the toxicity of its products.

87.     In late 2014, the International Agency for Research on Cancer (IARC) announced that it was recommending dozens of pesticides for evaluation, including glyphosate. When the IARC review was announced, Monsanto's Donna Farmer wrote to former employee, John Acquavella, in an email dated September 18, 2014: "Just wanted to let you that what we have long been concerned about has happened. [sic] Glyphosate is on for an IARC review in March 2015."

Farmer then wrote: "Glyphosate had been listed as a medium priority for 2015-2016 but clearly something happened and it got *moved* up to ultra priority."

88.     Monsanto not only anticipated the carcinogenic classification for glyphosate and glyphosate-based formulations, but pro-actively sought to combat the expected result by engaging supposed third-party academics who acted on Monsanto's behalf as purportedly "independent" experts in signing onto Monsanto ghostwritten reports which were then published in leading toxicology journals and in the media.

89.     In an email dated February 19, 2015, one month prior to the release of the IARC report on glyphosate, Monsanto executive William Heydens proposed that the company "ghost-write" sections of a paper on Roundup's toxicity. In the email, Heydens wrote that they would "add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak." Heydens also wrote that this is how Monsanto had "handled" an earlier paper on glyphosate's safety.

90.     As discussed more fully in the following section, the IARC released its findings in March 2015. The report classified Roundup as "probably carcinogenic." After the release of the IARC report, Monsanto set to work on a campaign to influence the press and public perception regarding the safety of its products. Again, the campaign involved ghostwriting drafts of articles that would appear in respected news magazines. In an email dated March 12, 2015, Eric Sachs of Monsanto asked Henry Miller, a Forbes contributor and fellow of the Stanford Hoover Institute, to write about the IARC "process and controversial decision" to classify Roundup as probably carcinogenic. Mr. Miller responded that he would be willing to assist Monsanto if he "could start

from a high-quality draft." In response, Monsanto informed Mr. Miller that Monsanto already had

"a draft nearly done" that it would send to Mr. Miller by tomorrow.

**From:** "ERIC S SACHS [AG/1000]" <span style="background:black">████████</span>
**To:** "Henry Miller" <span style="background:black">████</span> @ <span style="background:black">████</span>
**Sent:** Tuesday, March 17, 2015 10:23:03 AM
**Subject:** RE: IARC Outcomes, Process, and Response

We have a draft nearly done and will send to you by tomorrow.

Eric

91.     In another email dated May 11, 2015 and entitled "RE: Post-IARC Activities to

Support Glyphosate," Heydens wrote that Monsanto would ghost-write a manuscript refuting the

animal data cited by the IARC, noting that the manuscript "would be more powerful if authored

by non-Monsanto scientists (e.g., Kirkland, Kier, Williams, Greim, and maybe Keith Solomon)":

Publication on Animal Data Cited by IARC
- It was noted that this is only other idea that could be done prior to IARC Monograph publication
- Manuscript to be initiated by MON as ghost writers
- It was noted this would be more powerful if authored by non-Monsanto scientists  (e.g., Kirkland, Kier, Williams, Greim and maybe Keith Solomon)
- Decide within 1-2 weeks if we will recommend going forward with this

92.     After the IARC report came out, Monsanto also organized an ostensibly

independent "Expert Panel" for the purpose of conducting an evaluation of the IARC data. But the

Expert Panel was anything but an independent collection of neutral scientists rendering an opinion

on the toxicity of glyphosate. The conclusions of the Expert Panel were substantially edited and/or

authored by Monsanto's own executives.

93.     The question of the ethical permissibility of ghostwriting arose when, in the course

of assigning authorship, a member of the Expert Panel and former Monsanto employee, John

Acquavella, was excluded from a poster planned for a 2015 Society for Risk Analysis meeting. In

response, Heydens wrote in an email to Acquavella dated November 3, 2015: "I thought we

discussed previously that it was decided by our management that we would not be able to use you

or Larry [Kier] as Panelists/authors because of your prior employment at Monsanto . . . ."

Acquavella responded: "I didn't realize that Bill. Also, I don't think that will be okay with my

panelists. We call that ghost writing and it is unethical." In another email to Heydens in the same

chain, Acquavella wrote: "I can't be part of deceptive authorship on a presentation or publication.

Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical

regarding authorship."

> You guys know me  I can't be a part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes to determine what is honest/ethical regarding authorship.

94.     These concerns did not stop Monsanto from continuing to influence and author

reviews on the safety of glyphosate, while advertising the work as independent. In July 2016, the

journal Critical Reviews in Toxicology published "A review of the carcinogenic potential of

glyphosate by four independent expert panels and comparison to the IARC assessment." Sixteen

scientists signed their names to the published work, declaring to readers that their conclusions were

free of Monsanto's intervention. Underscoring the supposed independence of the work, the

declaration of interest section of the published review stated: "Neither any Monsanto company

employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission

to the journal." This was false. Internal Monsanto documents reveal that Heydens not only

reviewed the manuscripts but had a hand in drafting and editing them. The finished papers were aimed directly at discrediting IARC's classification. In one internal email, Heydens told the organizer of the panel: "I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing."

| | |
|---|---|
| **From:** | HEYDENS, WILLIAM F [AG/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
| **Sent:** | 2/9/2016 11:43:08 PM |
| **To:** | Ashley Roberts Intertek |
| **Subject:** | RE: summary article |
| **Attachments:** | Summary Manuscript Draft 2 0 Feb 5 2016 _jfa_wfh.docx |

Ashley,

OK, I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing. I took a crack at adding a little text on page 10 to address John's comments about toxicologists' use of Hill's criteria – see what you think; it made sense to me, but I'm not sure if it will to others - please feel free to further modify and/or run by Gary.

After you have looked through this, let's discuss.

95.     Internal Monsanto documents show that Heydens even argued over statements that he wanted included but that John Acquavella deemed "inflammatory" and "not necessary" criticisms of the IARC. Heydens' edits to draft documents contradicted Acquavella, even though Heydens was not supposed to have even reviewed the papers. Heydens went so far as to state: "I would ignore John's comment" and "I don't see a reason for deleting the text that John did below."

96.     The scientific literature is littered with ghostwritten papers declaring Roundup and glyphosate to be safe. Through its ghostwriting campaigns, Monsanto sought to hide or discredit independent research showing that its products are hazardous to human health. All the while, Monsanto advertised its products as completely safe and non-toxic to an unsuspecting public.

## False Representations Regarding the Safety of Roundup

97.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NY AG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup are the following:

a.    "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences..."

b.    "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging or trimming problem."

c.    "Roundup biodegrades into naturally occurring elements."

d.    "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.    "This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it."

f.    "You can apply Accord with…confidence because it will stay where you put it…it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g.    "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.    "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.    "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.        "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[7]

98.      On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.        its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.        its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c.        its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.        its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.        glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides

f.         its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

99.      Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

### IARC Classification of Glyphosate

100.     On March 15, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to

---

[7] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

glyphosate since 2001.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

101.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and dates relating to glyphosate exposure in humans.

102.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

103.    In preparing its Monograph, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

104.    The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

105.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

106.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

107.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

108.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma and several subtypes of non-Hodgkin lymphoma, and the increased risk persisted after adjustment for other pesticides.

109.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

110.    In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

111.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphonic acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

112.    In addition, the IARC Working Group found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

113.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

114.    Additionally, the IARC Working Group reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

115.    The IARC evaluation confirms that glyphosate is toxic to humans.

116.    Nevertheless, Monsanto since it began selling Roundup has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim that glyphosate-based herbicides, including Roundup, create no unreasonable risk to human health or to the environment.

117.    In a document titled "Glyphosate/Roundup in the News, Safety Information" issued on March 27, 2017, Monsanto disputes the findings of the IARC and states the following: "All labeled uses of glyphosate are safe for human health and supported by one of the most extensive worldwide human health databases ever compiled on a pesticide."[8]

118.    Dow and Albaugh, who manufacture the aquatic glyphosate-based products Rodeo and Aqua Star respectively, also continue to sell their products containing glyphosate, thereby assuring the public that their products are not hazardous to human health or to the environment.

---

[8] Monsanto, *Glyphosate/Roundup In the News, Safety Information*,
http://www.monsantoito.com/docs/Glyphosate_IT_O_Briefing.pdf, at 1 (March 27, 2015).

**The EPA's Review of Glyphosate**

119.    On September 12, 2016, the EPA's Office of Pesticides Program ("OPP") submitted a report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[9]

120.    The report is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[10]

121.    Thus, the OPP notes in the report that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[11]

122.    From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA

---

[9] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), available at https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.
[10] *Id.*
[11] *Id.*

Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[12]

123.    The OPP draft assessment does not actually consider how glyphosate, in conjunction with other chemicals, affects not only carcinogenicity but other physical injuries and illnesses.

### Other Studies on the Toxicity of Glyphosate

124.    In 2013, a study published in the scientific journal *Entropy* found that contrary to the current widely-held misconception that glyphosate is relatively harmless to humans, the available evidence shows that glyphosate may be the most important factor in the development of multiple chronic diseases and conditions such as inflammatory bowel disease, anorexia nervosa, obesity, diabetes, heart disease, depression, autism, infertility, cancer and Alzheimer's disease. By interfering with the biochemistry of bacteria in our gastrointestinal tract, consumption of glyphosate depletes essential amino acids and predisposes humans to a host of chronic health problems.[13]

125.    In 2016, the Ramazzini Institute, along with Bologna University, the Italian National Health Institute, George Washington State University and the Icahn School of Medicine, launched the Global Glyphosate Study as a pilot study. It was a single-dose study on the health effects of glyphosate-based herbicides on Sprague Dawley rats, which had been dosed with the U.S. EPA-determined safe limit of 1.75 micrograms per kilo of body weight. The results published in May 2018 showed that glyphosate-based herbicides—at doses deemed safe and over a relatively

---

[12] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

[13] Anthony Samsel and Stephanie Seneff, *Glyphosate's Suppression of Cytochrome P450 Enzymes and Amino Acid Biosynthesis by the Gut Microbiome: Pathways to Modern Diseases*, ENTROPY, 2013 at 15.

short exposure time—can alter certain important biological parameters, markers chiefly relating to sexual development, genotoxicity, and alteration of the intestinal microbiome. In sum, the scientists involved concluded that the results show that glyphosate poses a significant public health concern.

126.   Several other studies have demonstrated that exposure to low doses of glyphosate can have detrimental health effects on humans and animals.[14]

127.   In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that glyphosate-based formulations in Roundup and other products are more dangerous and toxic that glyphosate alone.

128.   Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and after the IARC first announced its assessment for glyphosate in March 2015.

129.   Andrew Jack Conroy is an IT&O Account Representative for Monsanto, responsible for sales and marketing to distributors, retailers, and users of Roundup and other glyphosate-containing products in Florida. Mr. Conroy engaged in the marketing, promotion and sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

---

[14] John P. Myers, et al., Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, 15 Environ. Health 9 (2016), available at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0; *see also* Gilles-Eric Seralini, et al, Republished study: long-term toxicity of a Roundup herbicide and a Roundup tolerant genetically modified maize, 26 Environ. Sci. Europe 14 (2014), available at http://enveurope.springeropen.com/articles/10.1186/s12302-014-0014-5; A.L. Benedetti, et al., The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb, 153(2) Toxicol. Lett. 227-32 (2004), available at http://www.ncbi.nlm.nih.gov/pubmed/15451553; K. Larsen, et al., Effects of Sublethal Exposure to a Glyphosate-Based Herbicide Formulation on Metabolic Activities of Different Xenobiotic-Metabolizing Enzymes in Rats, 33(4) Int. J. Toxicol. 307-18 (Jul. 2014), available at http://www.ncbi.nlm.nih.gov/pubmed/24985121; Robin Mesnage, et al., Transcriptome profile analysis reflects rat liver and kidney damage following chronic ultra-low dose Roundup exposure, 14 Environ. Health 70 (2015), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4549093.

130.     Defendants Diamond R, Griffin, Growers, and Harrells each had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger.

**Impurities in Roundup are Additive to the Formulation's Carcinogenicity**

131.     Apart from intentionally added ingredients like glyphosate, water, and a surfactant or anti-foam agent, Roundup formulations like those used by Plaintiff also contain carcinogenic impurities like n-nitrosoglyphosate ("NNG"), 1,4 dioxane, ethylene oxide, formaldehyde, and arsenic.

132.     Though these impurities *by themselves* are not responsible for Plaintiff's NHL, they are additive to the overall carcinogenic of Roundup formulations. Indeed, it is a generally accepted principle of toxicology that adding carcinogens to an already carcinogenic substance creates and additive or synergistic effect. *See* Kawaguchi I, Doi M, Kakinuma S, Shimada Y. Combined effect of multiple carcinogens and synergy index. J Theor Biol. 2006;243(1):143-151. For example, additives in cigarettes, like those in Roundup, make cigarettes more carcinogenic and dangerous, even though no scientists believe that the benzene, tar, or nitrosamines in cigarettes cause cancer independent of the cigarette as a whole.

133.     Monsanto was aware for decades that 1,4-dioxane, an impurity found in many Roundup surfactants, acts as a tumor promoter, meaning that it facilitates the growth of existing cancers, even if it does not cause them itself.

134.     Arsenic and formaldehyde (both indisputable carcinogens) are also impurities that exist within Roundup. Each makes the formulation more dangerous by suppressing the human immune system, thereby facilitates the development of NHL.

135.    According to Monsanto's sworn testimony, the amount of arsenic in Roundup products is only around 10 parts per billion ("ppb"). However, actual testing shows this is a massive underestimate; independent testing has reported arsenic as high as 173 ppb.

136.    Internally, Monsanto scientists do not consider these to be "trace impurities," a term made up by Monsanto's lawyers to downplay their nature.

137.    N-Nitrosoglyphosate ("NNG") is another impurity that is inherent to glyphosate.

138.    NNG belongs to a class of chemicals called nitrosamines. Nitrosamines are so dangerous that The Environmental Protection Agency ("EPA") *presumes* them to be carcinogenic when they occur at certain levels. EPA based its approach on testing that found that 80% of the nitrosamines tested are carcinogenic. *See* 45 Fed. Reg. 42855.

139.    Due to acute safety concerns with nitrosamines, EPA sets a hard limit of 1 part per million ("ppm") of NNG in pesticides, including glyphosate products.  *Id.*

140.    Glyphosate, by its nature, is an unstable chemical in the presence of nitrites. Any time glyphosate reacts with nitrites, which are prevalent in everyday environments such as city air, exhaust from cars, and water, glyphosate degrades into NNG.

141.    Monsanto's own scientist who invented QuikPro, Dr. Dyszlewski, admitted in sworn court testimony that Monsanto was aware their QuikPro had NNG levels far above the 1ppm level, with levels reaching as high as 52 ppm. (Evans v. Monsanto, St. Louis City Circuit Court, 11/2/22, Volume 7B, 9:14-16).

142.    In further testimony, when Dr. Dyslewski was asked if he knew in 2010 if he knew if NNG was safe or not, he stated, "I still believe in 2010 it [NNG] was a potential toxicologically significant material if it was above the limit that we agreed with the EPA to keep it [1ppm]." (Evans v. Monsanto, St. Louis City Circuit Court, 11/2/22, Volume 7B, 122:25-123:5)

### Plaintiff's Exposure to Roundup

143.     Plaintiff has lived in Port St. Lucie, Florida since at least July 2013.

144.     Plaintiff used Roundup products, including the highly concentrated Roundup "PRO" line of products and Monsanto's most dangerous Roundup formulation ever manufactured, QuikPRO, as a landscaper in Florida. Plaintiff began his professional use of Roundup products in 1990 and continued using Roundup products in a professional capacity well into 2022.

145.     QuikPro contains not only Glyphosate, but arsenic, diquat, formaldehyde, and nitrates, which are known carcinogens.  In addition, given the unique formulation of the product, certain chemical changes occur when this product is used and stored in its normal use, which increases the carcinogenic nature of the product.

146.     Plaintiff used and was exposed to Roundup in various locations around the state of Florida, including Ft. Lauderdale, in Broward County.

147.     Plaintiff also sprayed Roundup around his residential property.

148.     Although Plaintiff read and followed the label, throughout the entire time he used and was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or to the health of others.

149.     In early 2023, Plaintiff began noticing lesions on his skin. Photos of Plaintiff's lesions as they appeared in early 2023 are pictured below.



150.    On April 25, 2023, a skin biopsy identified the cause of Plaintiff's lesions: Mycosis Fungoides—a rare and often aggressive form of non-Hodgkin's Lymphoma.

151.    Despite treatment designed to manage his Mycosis Fungoides, Plaintiff's lesions continued to spread. The lesions continued to attack his hands and feet. A new formation of lesions attacked Plaintiff's face. Before long, Plaintiff's face was almost unrecognizable because of the spread of the lesions. A photo of Plaintiff's facial lesions is pictured on the next page.



152.    By May 2024, Plaintiff's lesions had overpowered his treatment regime. A cluster of lesions overtook Plaintiff's left leg. Plaintiff's left leg, consumed with septic lesions, are pictured on the following page.

153.    As a result of sepsis quickly spreading through Plaintiff's left leg, Plaintiff's doctors determined that they needed to amputate Plaintiff's left leg at the hip. This was an emergency procedure necessary to save Plaintiff's life.




## COUNT I
## STRICT PRODUCTS LIABILITY
### (Against Monsanto, Bayer CropScience LP, and Andrew Jack Conroy)

154.     Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

155.     This is a cause of action for strict products liability, including design defect, manufacturing defect, and failure to warn.

156.     **Product**: Monsanto, the Bayer Defendants, and Mr. Conroy (collectively, the "Manufacturer Defendants") designed, developed, manufactured, marketed, tested, assembled, labeled, distributed, sold, advertised, promoted, and placed into the stream of commerce Roundup products, which are defective and unreasonably dangerous, and to which Plaintiff was exposed. The Manufacturer Defendants knew or reasonably should have foreseen that the ultimate users, consumers, and persons exposed to Roundup products could not properly inspect for defects or dangers and that the detection of such defects or dangers could be beyond the capabilities of such persons.

157.     **Defects**: Roundup products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed were defective and unreasonably dangerous. At the time Roundup left the Manufacturer Defendants' control and was placed in the stream of commerce, Roundup had been designed defectively because it was in a condition that was unreasonably dangerous to the users and persons in the vicinity of the product; Roundup had been designed defectively because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer; Roundup had been designed defectively because the risk of danger in its design and formulation outweighed its benefits, and because there were alternative, safer designs and

formulations that were feasible; and Roundup was defective because the foreseeable risks of harm from Roundup could have been reduced or avoided by providing reasonable instructions or warnings, yet no such instructions or warnings were given. Specifically, Roundup was defective and unreasonably dangerous when placed in the stream of commerce for one or more of the following reasons:

a.       It was defective in design and formulation and dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.       It was unreasonably dangerous in that it was hazardous and posed a grave risk of serious illness when used in a reasonably anticipated manner;

c.       It was otherwise designed in a way that exposed persons to unnecessary and unreasonable risks, including by failing to provide adequate safeguards to protect persons exposed to foreseeable injuries;

d.       The Manufacturer Defendants failed to adequately test, investigate, and/or study Roundup products, including both its active ingredient glyphosate, its carcinogenic impurities and contaminants, and most importantly the combination of those components, to ensure their safety;

e.       Exposure to Roundup products presents a risk of harmful side effects that outweigh any potential utility stemming from use;

f.       The Manufacturer Defendants knew or should have known at the time of marketing Roundup products that exposure to Roundup products could result in severe injuries and illness;

g.       Defendants knew or should have known that Roundup, and particularly the concentrated Roundup products used by plaintiff, were more dangerous than glyphosate alone because of the presence of surfactants that aid in absorption of the formulation through human skin, and carcinogenic impurities like NNG, formaldehyde, 1,4 dioxane, arsenic, and ethylene oxide which are additive to the overall carcinogenicity of the formulated product;

h.       The Manufacturer Defendants did not conduct adequate post-marketing surveillance of its Roundup products;

i.       The Manufacturer Defendants could have employed safer alternative designs and formulations;

j.       The Manufacturer Defendants failed to use due care in the manufacturing and formulation of Roundup products;

44

k.      The Manufacturer Defendants failed to use due care in minimizing the dangers to users, consumers, and persons exposed to Roundup products, and to those who would foreseeably use or be harmed by Roundup products.

158.    The defects described above rendered Roundup unreasonably dangerous by making it dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

159.    The defects in Roundup products were present when the Manufacturer Defendants placed them into the stream of commerce.  Roundup products reached the intended consumers, handlers, users and other persons coming into contact and exposed with these products in Florida, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed labeled, and marketed by the Manufacturer Defendants.

160.    At all times material, Roundup products were being used in a manner intended by the Manufacturer Defendants, and in a manner that was reasonably foreseeable by them as involving a substantial danger not readily apparent.

161.    It was foreseeable that Plaintiff would be exposed to Roundup products.

162.    **Causation**: As a direct and proximate result of the defects in Roundup products, Plaintiff was exposed to the combination of glyphosate and other ingredients in Roundup products, causing or substantially contributing to Plaintiff's injuries. But for the defects in Roundup products, Plaintiffs injuries would not have occurred.

163.    **Damages**: Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.      bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.      mental anguish;

c.      loss of capacity for enjoyment of life;

d.      loss of earnings and/or loss of ability to earn money;

e.      expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.      all damages available under applicable law.

### COUNT II
### STRICT PRODUCTS LIABILITY FAILURE TO WARN
### (Against Monsanto, Bayer CropScience LP, and Andrew Jack Conroy)

164.    Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

165.    This is a cause of action for strict products liability, including design defect, manufacturing defect, and failure to warn.

166.    **Product**: Monsanto, the Bayer Defendants, and Mr. Conroy (collectively, the "Manufacturer Defendants") designed, developed, manufactured, marketed, tested, assembled, labeled, distributed, sold, advertised, promoted, and placed into the stream of commerce Roundup products, which are defective and unreasonably dangerous, and to which Plaintiff was exposed. The Manufacturer Defendants knew or reasonably should have foreseen that the ultimate users, consumers, and persons exposed to Roundup products could not properly inspect for defects or dangers and that the detection of such defects or dangers could be beyond the capabilities of such persons.

167.    **Defects**: Roundup products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed were defective and unreasonably dangerous. At the time Roundup left the Manufacturer Defendants' control and was placed in the stream of commerce, Roundup had been designed defectively because it was in a condition that was unreasonably dangerous to the users and persons in the vicinity of the product; Roundup had

been designed defectively because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer; Roundup had been designed defectively because the risk of danger in its design and formulation outweighed its benefits, and because there were alternative, safer designs and formulations that were feasible; and Roundup was defective because the foreseeable risks of harm from Roundup could have been reduced or avoided by providing reasonable instructions or warnings, yet no such instructions or warnings were given. Specifically, Roundup was defective and unreasonably dangerous when placed in the stream of commerce for one or more of the following reasons:

a.      It was defective in design and formulation and dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.      It was unreasonably dangerous in that it was hazardous and posed a grave risk of serious illness when used in a reasonably anticipated manner;

c.      It was otherwise designed in a way that exposed persons to unnecessary and unreasonable risks, including by failing to provide adequate safeguards to protect persons exposed to foreseeable injuries;

d.      The Manufacturer Defendants failed to adequately test, investigate, and/or study Roundup products, including both its active ingredient glyphosate, its carcinogenic impurities and contaminants, and most importantly the combination of those components, to ensure their safety;

e.      Exposure to Roundup products presents a risk of harmful side effects that outweigh any potential utility stemming from use;

f.      The Manufacturer Defendants knew or should have known at the time of marketing Roundup products that exposure to Roundup products could result in severe injuries and illness;

g.      Defendants knew or should have known that Roundup, and particularly the concentrated Roundup products used by plaintiff, were more dangerous than glyphosate alone because of the presence of surfactants that aid in absorption of the formulation through human skin, and carcinogenic impurities like NNG, formaldehyde, 1,4 dioxane, arsenic, and ethylene oxide which are additive to the overall carcinogenicity of the formulated product;

h.      The Manufacturer Defendants did not conduct adequate post-marketing surveillance of its Roundup products;

i.      The Manufacturer Defendants could have employed safer alternative designs and formulations;

j.      The Manufacturer Defendants failed to use due care in the manufacturing and formulation of Roundup products;

k.      The Manufacturer Defendants failed to use due care in warning of the risks associated with the use of and exposure to Roundup products;

l.      The Manufacturer Defendants failed to use due care in minimizing the dangers to users, consumers, and persons exposed to Roundup products, and to those who would foreseeably use or be harmed by Roundup products;

m.      The Manufacturer Defendants failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup and/or the full and complete risks of exposure to Roundup and glyphosate-containing products.

n.      The Manufacturer Defendants failed to adequately label, market, and promote Roundup products to ensure that such products did not cause persons exposed to them to suffer from unreasonable and dangerous risks;

o.      The Manufacturer Defendants failed to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of Roundup products.

168.    The defects described above rendered Roundup unreasonably dangerous by making it dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

169.    The defects in Roundup products were present when the Manufacturer Defendants placed them into the stream of commerce.  Roundup products reached the intended consumers, handlers, users and other persons coming into contact and exposed with these products in Florida, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed labeled, and marketed by the Manufacturer Defendants.

48

170.     At all times material, Roundup products were being used in a manner intended by the Manufacturer Defendants, and in a manner that was reasonably foreseeable by them as involving a substantial danger not readily apparent.

171.     It was foreseeable that Plaintiff would be exposed to Roundup products. These foreseeable risks of harm from the product could have been reduced or avoided by providing reasonable instructions or warnings, and the failure to provide those instructions or warnings makes the product unreasonably dangerous.

172.     **Causation**: As a direct and proximate result of the defects in Roundup products, Plaintiff was exposed to the combination of glyphosate and other ingredients in Roundup products, causing or substantially contributing to Plaintiff's injuries. But for the defects in Roundup products, Plaintiffs injuries would not have occurred.

173.     **Damages**: Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.     bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.     mental anguish;

c.     loss of capacity for enjoyment of life;

d.     loss of earnings and/or loss of ability to earn money;

e.     expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.     all damages available under applicable law.

**COUNT IV**
**NEGLIGENCE**
**(Against Monsanto, Bayer CropScience LP, and Andrew Jack Conroy)**

174.    Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

175.    This is a cause of action for negligence, including design defect, manufacturing defect, and failure to warn.

176.    **Duty**: Monsanto, the Bayer Defendants, and Mr. Conroy (previously defined as the "Manufacturer Defendants") had a duty to use reasonable care in the design, research, development, testing, assembly, packaging, manufacture, labeling, marketing, advertisement, promotion, sale, and distribution of its Roundup products in order to avoid persons exposed to Roundup products to unnecessary and unreasonable risks.

177.    The Manufacturer Defendants' duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup products.

178.    **Breach**: The Manufacturer Defendants breached that duty by acting in a way that a reasonably careful manufacturer, designer, advertiser, marketer, promotor, and distributor would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer, designer, advertiser, marketer, promotor and distributor would take under like circumstances. Specifically, the Manufacturer Defendants breached their duty of care in one or more of the following ways:

a.    By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b.    By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate and other ingredients in Roundup products, and consequently the risk of serious harm associated with human use and exposure to Roundup;

c.      By failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use;

d.      By failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of harm associated with exposure to Roundup and/or glyphosate as an herbicide;

e.      By failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.      By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup and glyphosate-containing products;

g.      By representing that its Roundup products were safe for their intended use when, in fact, the Manufacturer Defendants knew or should have known that the products were not safe for their intended purpose;

h.      By continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use;

i.      By continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

179.    The Manufacturer Defendants knew or reasonably should have foreseen that individuals such as Plaintiff would suffer injuries as a result of their failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Roundup products.

180.    **Causation**: As a direct and proximate result of the negligence of the Manufacturer Defendants, Roundup products caused Plaintiff's injuries. The Manufacturer Defendants' negligence caused or substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for their negligence, these injuries, damages, and losses would not have occurred.

181.    **Damages**: Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.      bodily injury resulting in pain and suffering, disability and/or disfigurement;

51

b.      mental anguish;

c.      loss of capacity for enjoyment of life;

d.      loss of earnings and/or loss of ability to earn money;

e.      expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.      all damages available under applicable law.

## COUNT V
## NEGLIGENT FAILURE TO WARN
### (Against Monsanto, Bayer CropScience LP, and Andrew Jack Conroy)

182.    Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

183.    This is a cause of action for negligence, including design defect, manufacturing defect, and failure to warn.

184.    **Duty**: Monsanto, the Bayer Defendants, and Mr. Conroy (previously defined as the "Manufacturer Defendants") had a duty to use reasonable care in the labeling, marketing, advertisement, and of its Roundup products in order to avoid persons they knew or reasonably should have known are involved in the reasonably foreseeable use(s) of the product.

185.    The Manufacturer Defendants' duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup products.

186.    **Breach**: The Manufacturer Defendants breached that duty by acting in a way that a reasonably careful manufacturer, designer, advertiser, marketer, promotor, and distributor would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer, designer, advertiser, marketer, promotor and distributor would take under like circumstances.  Specifically, the Manufacturer Defendants breached their duty of care in one or more of the following ways:

a.      By failing to provide adequate instructions, guidelines, and safety precautions to those persons who the Manufacturer could reasonably foresee would use and/or be exposed to its Roundup products;

b.      By failing to disclose to consumers and the general public, including Plaintiff, that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

c.      By failing to give appropriate warnings about other risks of which the Manufacturer Defendants knew or should have known are involved in the reasonably foreseeable use of and/or exposure to Roundup products;

d.      By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup and glyphosate-containing products;

e.      By representing that its Roundup products were safe for their intended use when, in fact, the Manufacturer Defendants knew or should have known that the products were not safe for their intended purpose;

f.      By declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup, glyphosate, and any other ingredients in Roundup products;

g.      By advertising, marketing, and recommending the use of Roundup products, while concealing and/or failing to disclose or warn of the dangers known by the Manufacturer to be associated with or caused by the use of or exposure to Roundup, glyphosate, and any other ingredients in Roundup products;

h.      By continuing to disseminate information to its consumers, which indicate or imply that Roundup products are not unsafe for use;

i.      By continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

187.    The Manufacturer Defendants knew or reasonably should have foreseen that individuals such as Plaintiff would suffer injuries as a result of their failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Roundup products.

188.    **Causation**: As a direct and proximate result of the negligent failure to warn of the Manufacturer Defendants, Roundup products caused Plaintiff's injuries. The Manufacturer Defendants' negligence caused or substantially contributed to causing Plaintiff to suffer economic

and non-economic damages. But for their negligence, these injuries, damages, and losses would not have occurred.

189.    **Damages**: Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.      bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.      mental anguish;

c.      loss of capacity for enjoyment of life;

d.      loss of earnings and/or loss of ability to earn money;

e.      expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.      all damages available under applicable law.

**COUNT VI**
**BREACH OF EXPRESS WARRANTIES**
**(Against Monsanto and Bayer CropScience LP)**

190.    Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

191.    At all relevant times, Defendants Monsanto and the Bayer Defendants (the "Corporate Manufacturer Defendants") engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangers to users and consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of the Corporate Manufacturer Defendants.

192.    Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by the Corporate Manufacturer Defendants.

193.    Before the time that Plaintiff was exposed to Roundup products, the Corporate Manufacturer Defendants expressly warranted to its consumers and users, including Plaintiff, that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended and were not unreasonably dangerous for their intended purpose, specifically, as horticultural herbicides.

194.    The Corporate Manufacturer Defendants, through their advertising and promotional materials, expressly warranted that Roundup products were safe for their intended use and were not unreasonable dangerous for their intended purpose.

195.    The Corporate Manufacturer Defendants, however, failed to disclose that Roundup products have dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

196.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

197.    The Corporate Manufacturer Defendants breached its express warranties, and Roundup did not conform to the representations made by Monsanto, in that Roundup products were not safe for their intended use.

198.    Plaintiff reasonably relied to her detriment on the Corporate Manufacturer Defendants' express warranties.

199.    As a proximate result of the Corporate Manufacturer Defendants' wrongful acts and omissions in placing its defective Roundup products into the stream of commerce and failing to warn Plaintiff of the increases risk of NHL associated with the use of and/or exposure to Roundup products as described herein, Plaintiff has suffered and continues to suffer severe physical and emotional injuries. Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.    bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.    mental anguish;

c.    loss of capacity for enjoyment of life;

d.    loss of earnings and/or loss of ability to earn money;

e.    expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.    all damages available under applicable law.

## COUNT VII
### FRAUDULENT MISREPRESENTATION
#### (Against Monsanto and Bayer CropScience LP)

200.    Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

201.    This is a cause of action for fraudulent misrepresentation under Florida common law.

202.    Defendants Monsanto and the Bayer Defendants (previously defined as the "Corporate Manufacturer Defendants") are the manufacturer, designer, distributor, seller or

supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff regarding the character and/or quality of Roundup for guidance in his decision to select Roundup for use.

203.    The Corporate Manufacturer Defendants had a duty to disclose material information about the serious health effects of its products to consumers such as Plaintiff. The Corporate Manufacturer Defendants intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase the Corporate Manufacturer Defendants' dangerous products.

204.    Specifically, the Corporate Manufacturer Defendants' advertisements and promotions, regarding Roundup, during the time when Plaintiff purchased and applied Roundup products from April 2001 to February 2012, made material misrepresentations to the effect that Roundup was safe and non-toxic, which the Corporate Manufacturer Defendants knew to be false, for the purpose of inducing consumers, such as Plaintiff, to purchase said product. The Corporate Manufacturer Defendants further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

205.    The Corporate Manufacturer Defendants' representations regarding the character or quality of Roundup were untrue. In addition, the Corporate Manufacturer Defendants fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by the Corporate Manufacturer Defendants to be associated with or caused by the use of or exposure to Roundup products and glyphosate.

206.    The Corporate Manufacturer Defendants had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

207.     Moreover, the Corporate Manufacturer Defendants purposely failed to conduct trials, tests, and studies of the risks associated with the full Roundup formulation—rather than merely the active ingredient glyphosate—because it knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans.

208.     Despite this knowledge, the Corporate Manufacturer Defendants intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements. Instead, the Corporate Manufacturer Defendants labeled, promoted, and advertised its products as safe and effective when it knew such statements to be false or when it knew that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup products to consumers, including Plaintiff.

209.     In supplying the false information, the Corporate Manufacturer Defendants failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff.

210.     Plaintiff relied to his detriment upon the Corporate Manufacturer Defendants' misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff relied upon the Corporate Manufacturer Defendants' representations that Roundup was safe for use and that the Corporate Manufacturer Defendants' labeling, advertisements, and promotions fully described all known risks of the product.

211.     The Corporate Manufacturer Defendants are estopped from relying on any statute of limitations defenses because the Corporate Manufacturer Defendants actively concealed the defects from consumers. Instead of revealing the defects, the Corporate Manufacturer Defendants continued to represent their products as safe for their intended use. Even at the time of the filing

of this suit—despite a mountain of contrary scientific data—the Corporate Manufacturer Defendants continue to represent their products as safe for their intended use.

212.   As a direct and proximate result of the Corporate Manufacturer Defendants' negligent misrepresentations, Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.   bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.   mental anguish;

c.   loss of capacity for enjoyment of life;

d.   loss of earnings and/or loss of ability to earn money;

e.   expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.   all damages available under applicable law.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION
### (Against Monsanto and Bayer CropScience LP,)

213.   Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated herein.

214.   This is a cause of action for negligent misrepresentation under Florida common law.

215.   Defendants Monsanto and the Bayer Defendants (previously defined as the "Corporate Manufacturer Defendants") are the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff regarding the character and/or quality of Roundup for guidance in his decision to select Roundup for use.

216.     The Corporate Manufacturer Defendants had a duty to disclose material information about the serious health effects of its products to consumers such as Plaintiff. The Corporate Manufacturer Defendants negligently failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase the Corporate Manufacturer Defendants' dangerous products.

217.     Specifically, the Corporate Manufacturer Defendants' advertisements and promotions regarding Roundup, during the time when Plaintiff purchased and applied Roundup products from April 2001 to February 2012, made material misrepresentations to the effect that Roundup was safe and non-toxic, which the Corporate Manufacturer Defendants should have known to be false, for the purpose of inducing consumers, such as Plaintiff, to purchase said product. The Corporate Manufacturer Defendants further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

218.     The Corporate Manufacturer Defendants' representations regarding the character or quality of Roundup were untrue.

219.     The Corporate Manufacturer Defendants' negligently suppressed material information regarding the safety of Roundup, including the dangers known by the Corporate Manufacturer Defendants to be associated with or caused by the use of or exposure to Roundup products and glyphosate.

220.     Based on the results of trials, tests, and studies of exposure to glyphosate, the Corporate Manufacturer Defendants should have known or could have reasonably discovered the risk of serious harm associated with human use of and exposure to Roundup.

221.     The Corporate Manufacturer Defendants purposely and/or negligently failed to conduct trials, tests, and studies of the risks associated with the full Roundup formulation—rather

than merely the active ingredient glyphosate—because they knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans and/or because it wanted to avoid discovering whether Roundup was unsafe or toxic to humans.

222.    As a result, the Corporate Manufacturer Defendants negligently misrepresented or omitted this information in their product labeling, promotions and advertisements. Instead, the Corporate Manufacturer Defendants labeled, promoted, and advertised its products as safe and effective when they should have known such statements to be false or when they should have known that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup products to consumers, including Plaintiff.

223.    In supplying the false information, the Corporate Manufacturer Defendants failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff.

224.    Plaintiff justifiably relied to his detriment upon the Corporate Manufacturer Defendants' misrepresentations and/or omissions in their labeling, advertisements, and promotions concerning the serious risks posed by the product.  Plaintiff justifiably relied upon the Corporate Manufacturer Defendants' representations that Roundup was safe for use and that Monsanto's labeling, advertisements, and promotions fully described all known risks of the product.

225.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup products or glyphosate.

226.    The Corporate Manufacturer Defendants are estopped from relying on any statute of limitations defenses because the Corporate Manufacturer Defendants actively concealed the defects from consumers. Instead of revealing the defects, the Corporate Manufacturer Defendants continued to represent its products as safe for their intended use.

227.     As a direct and proximate result of the Corporate Manufacturer Defendants'

negligent misrepresentations, Plaintiff has been damaged and claims all damages to which he is

entitled, including, as applicable law may provide, but not limited to:

a.       bodily injury resulting in pain and suffering, disability and/or
disfigurement;

b.       mental anguish;

c.       loss of capacity for enjoyment of life;

d.       loss of earnings and/or loss of ability to earn money;

e.       expensive hospitalization, medical treatment and/or care which losses
are either permanent or will continue; and/or

f.       all damages available under applicable law.

## COUNT IX
### STRICT LIABILITY
#### (Against Diamond R Fertilizer Co., Inc., Ben Hill Griffin, Inc., Growers
#### Fertilizer Corp., and Harrell's Inc.)

228.     Plaintiff incorporates by reference paragraphs 1 through 153 as if fully stated

herein.

229.     Defendants Diamond R, Griffin, Growers, and Harrells (collectively, the

"Distributor Defendants") engaged in the business of selling and distributing glyphosate-based

products, including Roundup, to the public for application throughout Saint Lucie County.

230.     Plaintiff purchased Roundup products from the Distributor Defendants for use at

his home during the period from 1990 to 2022. Plaintiff also professionally sprayed Roundup

products distributed by Diamond R, Griffin, Growers, and Harrells between 1990 and 2022.

231.     **Product**: Monsanto, the Bayer Defendants, and Mr. Conroy (collectively, the

"Manufacturer Defendants") designed, developed, manufactured, marketed, tested, assembled,

labeled, distributed, sold, advertised, promoted, and placed into the stream of commerce Roundup

products, including but not limited to the highly concentrated Roundup "Pro" line of products used by Plaintiff, which are defective and unreasonably dangerous, and to which Plaintiff was exposed. The Manufacturer Defendants knew or reasonably should have foreseen that the ultimate users, consumers, and persons exposed to Roundup products could not properly inspect for defects or dangers and that the detection of such defects or dangers could be beyond the capabilities of such persons.

232.    **Defects**: Glyphosate-based herbicides, such as Roundup, were defective and unreasonably dangerous when sold by the Distributor Defendants because they failed to perform as safely as an ordinary consumer would expect when used as intended or used in a reasonably foreseeable manner, because the risk of danger in their design outweighed any benefits, and because there were alternative, safer designs that were both technologically and economically feasible.  Specifically, glyphosate-based herbicides, including Roundup products, sold for use throughout Saint Lucie County were defective and unreasonably dangerous for one or more of the following reasons:

a.    They contain chemicals and ingredients that expose individuals coming into contact with them to unnecessary and unreasonable risks;

b.    They failed to provide warnings that would alert users and persons exposed to their dangerous conditions;

c.    They failed to provide users and persons exposed with reasonable safety in the event of foreseeable uses.

d.    They have a propensity to interact in the body of a person exposed to them in such a way as to cause serious harm;

233.    These defects were present when the Distributor Defendants sold Roundup products to Plaintiff for application at his home resulting in Plaintiff's exposure to such products.

The defects were expected to and did reach Plaintiff without substantial change affecting their condition.

234. **Causation**: As a direct and proximate result of the defects in Roundup products sold to Plaintiff, Plaintiff was exposed to unreasonably dangerous chemicals and ingredients. But for the defects in the Roundup products sold to Plaintiff, Plaintiff's injuries would not have occurred.

235. **Damages**: Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

a.      bodily injury resulting in pain and suffering, disability and/or disfigurement;

b.      mental anguish;

c.      loss of capacity for enjoyment of life;

d.      loss of earnings and/or loss of ability to earn money;

e.      expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

f.      all damages available under applicable law.


WHEREFORE, Plaintiff, Phillip Dressel, sues Defendants for compensatory damages, costs and such other relief as this Court deems appropriate. Furthermore, Plaintiff demands a trial by jury of all issues triable as of right by a jury.

DATED: April 21, 2025

Respectfully submitted,

BAILEY GLASSER, LLP
D. Todd Mathews, FL Bar No. 163104
Brian Glasser, *Pro Hac to be Applied for*
David Selby, *Pro Hac to be Applied for*
600 Cleveland St.
Suite 316
Clearwater, FL 33775
877-852-0342
tmathews@baileyglasser.com
bglasser@baileyglasser.com
Dselby@baileyglasser.com

VanderHahn,LLP
Devin van der Hahn, *Pro Hac to be Applied for*
1000 Main St
Suite 2300
Houston, TX 77002
281-688-5000

65